**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:

**ATHENA DEVELOPMENT, LLC**          **Case No.: 8:12-bk-00011-MGW**
                                      **Chapter 11 Case**

 **Debtor.**
_____/

**ORDER FINALLY GRANTING, IN PART,**
**AND DEFERRING, IN PART, MOTION TO MODIFY**
**CONFIRMED PLAN (Doc. 152) AND CONTINUING HEARING ON SAME**

THIS CASE having come on for a continued hearing on April 10, 2013 ("Hearing"), on

the Debtor's Motion to Modify Confirmed Plan (Doc. 152) ("Motion"), this Court having heard

argument from counsel for the Reorganized Debtor and counsel for German American Capital

Corporation ("GACC"), this Court having reviewed the Motion, as well as the Order

Preliminarily Granting, in Part, Deferring, in Part, and Denying as Moot, in Part, Motion to

Modify Confirmed Plan (Doc. 167) ("Preliminary Sale Order") and being otherwise familiar with

the papers and pleadings in this case, accordingly, it is

**ORDERED**

1.       The Motion, as was orally amended in open court at the hearing on March 27,

2013, which was preliminarily granted in the Preliminary Sale Order, is hereby finally

GRANTED, IN PART, and otherwise DEFERRED, IN PART, as further set forth herein.

2.       The treatment of GACC's claim by and through the Second Amended Chapter 11

Plan dated as of June 13, 2012 [1] (Doc. 114), as amended and modified by this Court's entry of

the Order Confirming Second Amended Chapter 11 Plan dated as of June 13, 2012 (Doc. 137)

and the Preliminary Sale Order, is hereby modified, solely to the extent that the Reorganized

_____
[1] Unless otherwise defined herein, defined terms shall retain the meaning given in the Motion.

Debtor is finally authorized to sell the Summit Property pursuant to the Lot Purchase Agreement attached to the Motion as Exhibit C and as amended by the First Amendment to Lot Purchase Agreement (collectively, the "Agreement"), provided the Inspection Period (as defined in the Agreement) shall end on April 30, 2013 and the Closing Date (as defined in the Agreement) shall occur on or before May 31, 2013. A true and correct copy of the Agreement is attached hereto as **Exhibit 1.**

3.      Any further modifications to the terms of the Agreement or the deadlines set forth in this Order are subject to either GACC's written consent or further Order of the Court.

4.      The Court will conduct a continued status hearing on the Motion on June 12, 2013, at 9:30 am. At that time, this Court may schedule further hearings on any remaining relief requested in the Motion.

5.      The Court shall retain the fullest jurisdiction necessary to interpret and give effect to this Order.


                                                                April 23, 2013
**DONE and ORDERED** in Chambers at Tampa, Florida, on _____.


                                                    _____
                                                    Michael G. Williamson
                                                    United States Bankruptcy Judge


**Copies via CM/ECF to:**
**Steven M. Berman, Esq.,** 101 E. Kennedy Blvd, Suite 2800, Tampa, FL 33602
**Adam Alpert, Esq.,** PO Box 3913, Tampa, FL 33601
**Office of the United States Trustee**, Timberlake Annex, Suite 1200, 501 N. Polk St., Tampa, FL 33602

# EXHIBIT 1

# LOT PURCHASE AGREEMENT

**THIS LOT PURCHASE AGREEMENT** (this "Contract") is made and entered into this 31ˢᵗ day of January, 2013 (the "Effective Date") by and between **ATHENA DEVELOPMENT, LLC**, a Georgia limited liability company (the "Seller") and **FISCHER DEVELOPMENT COMPANY II, INC.**, a Kentucky corporation (the "Purchaser").

## W I T N E S S E T H:

For and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration in hand paid by Purchaser to Seller, the receipt and sufficiency of which are hereby acknowledged by Seller, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

The terms hereinafter used shall have the following meanings unless the context of this Contract otherwise requires:

"Contract" means this Contract and all written amendments, modifications, and supplements thereto executed by both Purchaser and Seller.

"Closing" means the act of settlement of the purchase and sale of the Lots at which title is conveyed from Seller to Purchaser.

"Closing Date" means the date which falls on that date which is thirty (30) days from and after the end of the Inspection Period; *provided, however*, (i) Purchaser may extend the Closing Date for two (2) consecutive additional thirty (30) day periods by payment to Seller of a Ten Thousand and No/100 ($10,000.00) Closing Date extension fee for each such extension (such payment to be made, if at all, not later than one (1) day prior to the commencement of the applicable extension period), which extension payments shall be non-refundable to Purchaser unless the Closing fails to take place as a result of Seller's acts, omissions, or failure to meet any obligation imposed on Seller pursuant to the terms and conditions of this Contract (including, but not limited to, obtaining releases of the Property from any and all lenders having a loan or other indebtedness secured by the Property), and (ii) in addition to the foregoing, Purchaser shall have the continuing right, but not the obligation, to extend the Closing Date without payment of the aforesaid $10,000.00 Closing Date extension fee(s) for such additional period as may be agreed upon by Purchaser in the event Seller has not obtained and delivered to Purchaser, prior to the Closing Date, written approval of the sale of the Property to Purchaser pursuant to the terms hereof from any and all lenders having a loan or other indebtedness secured by the Property.

"Declaration" means the currently existing Declaration of Covenants, Restrictions and Easements recorded in the Official Records of Cobb County Georgia at Book 14201, Page 4896, or similar recorded document for the Subdivision, which instrument encumbers the Lots with conditions, restrictions, and assessments (the "Restrictive Covenants").

1

Tcm 1-31-13

"Deed" means a Limited Warranty Deed conveying good and marketable title in fee simple to the Lots that Purchaser purchases pursuant hereto, subject only to the Permitted Exceptions.

"Effective Date" means the effective date of this Contract, which shall be the date last executed by Seller and Purchaser.

"Environmental Laws" means and shall refer to the comprehensive Environmental Response Compensation and Liability Act of 1980 and the Super Fund Amendments and Reauthorization Act; the Hazardous Materials Transportation Act; the Resource Conservation and Recovery Act of 1976; the Federal Water Pollution Control Act; the Clean Air Act; the Toxic Substances Control Act of 1976; the Safe Drinking Water Act; the Occupational Safety and Health Act of 1970; and the Emergency Planning and Community Right to Know Act; each as heretofore or hereafter amended or supplemented and any future or present local, state or federal statute, rule or regulation pertaining to the regulation and protection of the environment, industrial hygiene, pollution, or environmental effect on health and safety.

"Existing Title Exceptions" means all of the exceptions set forth in the Title Commitment with respect to the Property and all matters shown on the Survey, if any, which indicate the existence of encumbrances not listed in the Title Commitment.

"Earnest Money" means (a) the initial sum of Fifty Thousand and No/100 ($50,000.00) Dollars, which amount shall be deposited by Purchaser with the Title Company within five (5) business days from and after the Effective Date; and (b) an additional sum of Fifty Thousand and No/100 ($50,000.00) Dollars which shall be deposited by Purchaser with the Title Company if, at the end of the Inspection Period, Purchaser (i) elects to continue the transaction contemplated by this Contract; or (ii) fails to terminate this Contract at the end of the Inspection Period as set forth in Section 3.05 hereof. The Earnest Money shall either be (i) delivered by the Title Company to the Seller at Closing (as hereinafter defined) as a part of the Lot Purchase Price; or (ii) disbursed as otherwise provided herein.

"Governmental Authorities" means the federal government, the State of Georgia, the City of Powder Springs, the County of Cobb, and any other agency or instrumentality thereof having jurisdiction over Seller or Purchaser (as the case may be), the Subdivision, the Lots, or any portion to hereof.

"HOA" means any applicable homeowners' association for the Subdivision created by a validly recorded and existing Declaration.

"Inspection Period" means the period of time commencing upon the Effective Date and ending on the sixtieth (60th) day thereafter.

"Lot Purchase Price" means the total purchase price of Two Million Seven Hundred Fifty Thousand and No/100 ($2,750,000.00) Dollars for the forty-six (46) developed residential lots being purchased (an average price of $59,782.61 per Lot), as such purchase price may be adjusted as set forth herein. The Lot Purchase Price, as the same has been or may be adjusted by

TDM 1-31-13

credits and/or prorations described herein, shall be paid in immediately good funds at the time of Closing.

"Lots" means all of those forty-six (46) developed residential lots located in the Lost Mountain Summit subdivision, City of Powder Springs, Cobb County, Georgia and further described on Exhibit "A" attached hereto and by this reference incorporated herein.

"Permitted Exceptions" means the Restrictive Covenants and those Existing Title Exceptions to which Purchaser shall not object or with respect to which Purchaser has waived objection in accordance with the provisions hereof.

"Property" means all or any portion of the Lots available for Purchaser's purchase under this Contract, together with all and singular the rights, hereditaments and appurtenances pertaining thereto.

"Residence" means and refers to a detached, single-family home and garage to be constructed on the Lot. As the context may require, the term "Residence" includes the Lot upon which it is constructed.

"Subdivision" means The Summit at Lost Mountain subdivision located in Cobb County, Georgia.

"Term" means the term of this Contract, which shall run from the Effective Date hereof through and until Closing, unless otherwise mutually agreed by the parties in writing.

"Title Commitment" means a written commitment from the Title Company indicating the then current status of title to each Lot, subject only to the standard printed exceptions and to all easements, rights-of-way, liens, restrictions, and other encumbrances which (i) are of record and known to the Title Company and (ii) affect the subject Lot.

"Title Company" means:    William H. Dodson II LLC
6000 Lake Forrest Dr., N.W., Suite 200
Atlanta, GA 30328-3896
Attn: William H. Dodson, II, Esq.
Phone: (404) 250-9800
Fax: (404) 250-0535

"Title Policy" means the owner policy of title insurance to be issued by the Title Company pursuant to the Title Commitment.

## ARTICLE II
## PURCHASE AND SALE

Seller hereby agrees to sell and convey to Purchaser, and Purchaser hereby agrees to purchase and accept from Seller, the Lots in their "as is", "where is" condition, said conveyance

TDM 1·31·13

to be for the consideration and upon and subject to the terms, provisions, and conditions, set forth in this Contract.

## ARTICLE III
## TITLE AND SURVEY; INSPECTION PERIOD

3.01    Title Commitment.   Purchaser shall cause, at Purchaser's sole cost and expense, the Title Company to deliver to Purchaser the Title Commitment issued through the Title Company and setting forth the state of title to the Property, and all exceptions to coverage which would appear in the Title Policy, together with copies of all instruments identified in the Title Commitment as exceptions to title. Purchaser, at Purchaser's sole cost and expense, may cause the Title Commitment to be updated before the Closing. If after receipt of the original or an updated Title Commitment, together with copies of the instruments referred to therein as exceptions, Purchaser determines that any matter disclosed by the original or an updated Title Commitment which has not previously been approved by Purchaser (or deemed approved by Purchaser failing to timely make objection thereto) is unacceptable to Purchaser for any reason whatsoever, Purchaser shall so notify Seller in writing specifying such objectionable matters on or before ten (10) days after the date Purchaser actually receives a copy of such original or updated Title Commitment, together with copies of the instruments referenced therein. Seller shall have a period of ten (10) days following the receipt of such notice from Purchaser to cure such defect (provided that, subject to the provisions provided in this paragraph, Seller shall not be obligated to cure any such title defect, and, in the event the defect is cured, the date of the Closing will be extended for a period of time equal to the period of time, if any, such Closing was delayed in order for Seller to cure such defect). If (i) Seller is unable or unwilling to cure such defects within the ten (10) day period; or (ii) Seller promptly gives written notice to Purchaser that it is unwilling or unable to cure Purchaser's objection(s), Purchaser may, as Purchaser's sole and exclusive remedies, either:  (a) terminate this Contract within ten (10) business days after expiration of Seller's allotted time to cure or receipt of Seller's notice to Purchaser (as the case may be) and receive a full refund of its Earnest Money, in which case neither party shall have any further obligations hereunder except as otherwise provided herein; or (b) maintain this Contract in effect with the obligation to purchase the Lots at Closing subject to such defects not cured by Seller which will be included in the definition of Permitted Exceptions. If Purchaser fails to notify Seller of such election within the prescribed ten (10) day period, Purchaser shall be deemed to have selected alternative (b) with the effect that Purchaser has waived its right to terminate this Contract. Notwithstanding any provision hereof to the contrary, Seller shall be responsible for and shall, on or before Closing, remove or cure (i) all liens, judgments, security interests, or similar encumbrances securing or evidencing indebtedness imposed on the Lots, (ii) all mechanics and materialmen's liens encumbering the Property (except those due to Purchaser's acts or omissions), (iii) all liens for taxes and other unpaid assessments which are due and payable as of the Closing (subject to the application pro-ration provision contained herein), and (iv) all other liens related to Seller's development of the Property (collectively, the "Monetary Liens"), and Seller shall cause all such Monetary Liens to be released or insured against as of the Closing, and it shall not be necessary for Purchaser to make formal objection to the existence of any liens described in this sentence.

4

TOM 1-31-13

3.02　Additional Permitted Exceptions.　In addition to the Permitted Exceptions as provided in Section 3.01, the following Permitted Exceptions shall not be considered defects in or objections to title:

　　　　A.　Subject to Purchaser's right to review and approve as set forth in Section 3.05 hereof, the Declaration; and

　　　　B.　The matters to which the Deed is to be subject as provided in Section 3.03, below.

3.03　Title to be Conveyed.　At Closing, Seller shall convey to Purchaser by the Deed good and marketable title in fee simple to the Lots, free and clear of any and all liens, encumbrances, conditions, assessments and easements, except the following, which are referred to herein as the "Permitted Exceptions" and are hereby approved in writing by Purchaser:

　　　　A.　General real estate taxes for the year of such Closing and subsequent years not yet due and payable.

　　　　B.　Easements, dedications, and rights-of-way shown on the recorded plat or otherwise approved in writing by Purchaser (provided Purchaser shall not unreasonably withhold or delay its approval of any utility easement that does not materially or adversely affect the value of the Lots);

　　　　C.　The Protective Covenants then recorded and in effect, and which have been provided to and approved by the Purchaser prior to Closing; and

　　　　D.　Other matters indicated by the Title Commitment to which Purchaser does not validly object (where objection is required), or has waived as provided in Section 3.01.

3.04　Title Policy; Survey.　The Title Company shall issue the Title Policy at Closing, based on the most recent Title Commitment.　If the Seller is unable to deliver good and marketable fee simple title to any Lot to Purchaser, subject only to the Permitted Exceptions and Seller is therefore unable to cause the Title Company to issue the Title Policy set forth herein, Purchaser shall have no obligation to purchase such Lot.　If a survey of a Lot is required by Title Company as a condition to the issuance of the Title Policy, Purchaser shall obtain such survey the cost of which shall be borne by Purchaser.　The Title Policy will be issued by the Title Company, will be in the amount of the total Lot Purchase Price with respect to the Lots covered and will insure Purchaser's fee simple title to the Lots then being purchased subject to no exceptions other than the liens and exceptions created by Purchaser and the Permitted Exceptions.　With regard to the standard printed exceptions contained in the Title Policy, Seller shall deliver at Closing an Owner's Affidavit in form and content sufficient to allow the Title Company to delete the standard printed exceptions.

3.05　Inspection Period.　During the Inspection Period Purchaser shall have the right to physically inspect, and to cause one or more engineers or other representatives of Purchaser to physically inspect, the Property.　Purchaser shall make such inspections in good faith and with due diligence.　All inspection fees, appraisal fees, engineering fees and other expenses of any

Tom 1·31·13

kind incurred by Purchaser relating to the inspection of the Property will be solely Purchaser's expense. Seller shall cooperate with Purchaser in all reasonable respects in making such inspections. Seller hereby reserves the right to have a representative present at the time Purchaser conducts any inspection of the Property. Purchaser shall notify Seller not less than one (1) business day in advance of commencing a phase II environmental inspection. In making any inspection, Purchaser will treat, and will cause any representative of Purchaser to treat, all information obtained by Purchaser pursuant to the terms of this Contract as strictly confidential. Purchaser agrees to indemnify and hold Seller its successors and assigns, harmless from any and all injuries, losses, liens, claims, judgments, liabilities, costs, expenses or damages (including reasonable attorneys' fees and court costs) sustained by or threatened against Seller which result from or arise out of any inspections by Purchaser or its authorized representatives pursuant to this paragraph. Notwithstanding any provision herein to the contrary, the indemnity contained in the preceding sentence shall survive the termination of this Contract or the Closing. In the event Purchaser determines as a result of the foregoing that the condition of the Lots (or a Lot) is deficient in any respect, or determines for any other reason in Purchaser's sole and absolute discretion such Lot(s) are not suitable for Purchaser's business, Purchaser may elect to terminate this Contract by delivering written notice thereof to Seller prior to the expiration of the Inspection Period, and upon such termination the Title Company shall immediately return the Earnest Money to Purchaser.

3.06    Within five (5) days from and after the Effective Date, Seller shall deliver to Purchaser, at no additional cost to Purchaser, electronic copies (if possessed by Seller) or tangible copies (if electronic copies are unavailable) of all land planning documents, permits, HOA documentation, if applicable (including the HOA budgets for the 2011 and 2012 calendar years, and the projected budget for the 2013 calendar year, if applicable), and governmental approvals for the Lots including but not limited to:

(i)     All completed or approved preliminary plans and improvement drawings.

(ii)    All engineering plans and studies.

(iii)   All as-built drawings for completed improvements.

(iv)    All geotechnical reports and geotechnical tests.

(v)     All environmental reports, test and assessments, including any phase I report.

(vi)    All governmental approval and permit documents, specifically: zoning, subdivision, engineering, NOI's and PTI's.

(vii)   Copies and details of all bonds posted for improvements already made to the Subdivision and the Lots.

(viii)  Status report of all work completed and uncompleted.

(ix)    Verification that all work completed by or on behalf of Seller has been paid or full disclosure and details for any outstanding unpaid invoices including liens filed on the Subdivision and the Lots.

(x)     All outstanding agreements, obligations and commitments pertaining to the ownership and/or development of the property with all governmental authorities, utility companies and other parties, including, but not limited to, all development agreements, lot sale agreements, utility extension and reimbursement agreements and public assessment agreements. The foregoing shall include any agreements between Seller and any public

utility provider regarding the prepayment of pending credits for utility taps or other permits or services.

(xi)    Complete disclosure of any outstanding performance obligations that encumber or affect in any way whatsoever, the property, including, by way of illustration but not limitation, the completion of public improvements, streets and utilities. Disclosure of all information regarding existing or required performance or maintenance bonds for such improvements made to the Property.

In addition to the foregoing, Seller shall also deliver to Purchaser within said five (5) day period, the following:

(xii)    Copies of all title policies, title commitments and title exceptions referenced therein, pertaining to the Lots and Subdivision.

(xiii)    Copies of all surveys, surveyor inspection reports, plats (preliminary and recorded) of the Lots and the Subdivision;

(xiv)    Copies of the Declaration and all amendments thereto, if any.

(xv)    Ad valorem real property tax bills for the Lots for the last three (3) years.

## ARTICLE IV
## CLOSING

Provided that Purchaser is not in default of this Contract and all terms and conditions of this Contract have been fulfilled, the Closing shall be held on the Closing Date, and shall take place at the offices of Merritt Watson, LLP, 200 Galleria Parkway, Suite 500, Atlanta, Georgia 30339.

## ARTICLE V
## CONDITIONS TO CLOSING

5.01    Purchaser's Obligations. In addition to the performance by Seller hereunder, the obligation of Purchaser to purchase the Lots is subject to the satisfaction as of the Closing Date of the following conditions, any of which may be waived in whole or in part by Purchaser at or prior to Closing:

A.    The representations and warranties of Seller set forth herein shall be true in all material respects on and as of the Closing Date with the same force and effect as if such representations and warranties were made on and as of the Closing Date.

B.    There shall be no general moratorium imposed by any Governmental Authority or utility supplier with respect to the issuance of building permits affecting the Lots to then be purchased or sanitary sewer, water, natural gas, electricity, telephone or cable connections with respect to such Lots.

C.    There shall be no Monetary Liens on the Lots being acquired by Purchaser.

D.     Seller shall have caused the Purchaser to become the "Declarant" as that term is defined in the Declaration, and at the time of closing, Purchaser, as Declarant, shall have control of any architectural control or plan review committee (or similar homeowner's or developer committee) having authority to approve plans, specifications and elevations for residences to be built within the Subdivision. Seller shall indemnify and hold Purchaser harmless from and against any and all claims, including, but not limited to, claims, losses, suits, causes of action, costs, expenses, charges, unpaid homeowner's assessments and/or fees, which any person or entity has or may have against the Seller, as the Declarant, at the time of Closing.

E.     Seller shall assign to Purchaser at Closing, if Seller owns such rights with respect to the Property, all assignable engineering, geotechnical, environmental and development plans (in hard copy and electronic form to the extent presently in existence), all reports, studies and approvals and permits of governmental authorities and utilities, and all rights and credits to utility reimbursement agreements and all rights and credits for prepaid utility tap ins or other utility permits or services.

F.     Seller shall have delivered to Purchaser, not later than five (5) business days prior to the Closing Date, the Lender Approval and the Court Approval, as described in Section 2 of the Special Stipulations set forth on Exhibit "B" hereof.

5.02     Seller's Obligation.     The obligation of Seller to perform its obligations herein and to sell Lots to Purchaser pursuant to this Contract is conditioned upon Purchaser having performed all obligations to be performed by it under this Contract in a timely manner and Purchaser not being in default under any term, provision, agreement, covenant or condition contained herein.

## ARTICLE VI
## CLOSING PROCEDURES

At Closing, Seller and Purchaser shall have the following obligations:

A.     Seller shall deliver to Purchaser a duly executed and acknowledged Limited Warranty Deed conveying to Purchaser the Lots being purchased, and such further instruments as may be reasonably required by Purchaser or the Title Company with respect to the Lots being purchased as provided herein, at Seller's expense.

B.     Purchaser shall pay the total Lot Purchase Price for the Lots then being purchased to Seller for such Lots and deliver to the Title Company such further instruments as may be reasonably required by Seller or the Title Company to consummate the purchase of the Lots then being purchased by Purchaser. The total Lot Purchase Price shall be adjusted by receipt of the Earnest Money by Seller at Closing and by any other adjustments and/or prorations described herein.

C.     General real estate taxes with respect to each Lot shall be prorated as of the date of Closing. If subsequent to the Closing, by reason of change in assessment or change in rate or for any other reason, real estate taxes for any fiscal year covered by the

TDM 1-31-13

apportionment should be determined to be higher or lower than those that are apportioned, a new computation and retroactive adjustment shall be made between Seller and Purchaser within ten (10) days of demand therefore by either party. The provisions of this subsection shall survive Closing.

D.     Seller shall deliver to Purchaser in accordance with Section 1445 of the Internal Revenue Code and regulations promulgated thereunder an affidavit by the Seller stating, under penalty or perjury, the Seller's United States taxpayer identification number and that the Seller is not a foreign person as defined by I.R.C. 1445(f)(3).

E.     Seller shall assign to Purchaser all of Seller's right, title and interests as the Declarant, as defined in the Declaration in a manner sufficient that when combined with Lender's Approval shall cause Purchaser to be the Declarant and to permit Purchaser, as Declarant, to have control of any architectural control or plan review committee (or similar homeowner's or developer committee) having authority to approve plans, specifications and elevations for residences to be built within the Subdivision, and shall execute and deliver to Purchaser the indemnification agreement described in Section 5.01 D hereof. Said indemnification agreement to be in form and content reasonably acceptable to the Purchaser.

F.     Complete and sole possession of the Lots being purchased will be delivered to Purchaser subject only to the Permitted Exceptions.

G.     Purchaser shall pay the cost of the basic premium for the Title Policy and any additional premiums for any endorsements requested by Purchaser (to the extent the Title Company agrees to provide such endorsements). Any real estate transfer tax shall be paid by the Seller. The cost to record the Deed shall be paid the Purchaser. All other costs and expenses related to the Closing and not otherwise allocated herein shall be paid by Seller and Purchaser as is customary in Cobb County, Georgia, in the purchase and sale of property similar to the Lots. Each of Seller and Purchaser shall bear the cost of their respective attorneys, contractors or agents.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES

7.01    Seller's Representations and Warranties.   Seller represents and warrants to Purchaser that to the best of Seller's actual knowledge after due inquiry (a) there is no pending or threatened condemnation, eminent domain or similar proceeding affecting the Property or any portion thereof; (b) there exist no uncured written notices which have been served by any Governmental Authority of violations of law, rules or regulations (including any environmental laws or regulations) which would affect the Property or any portion thereof or its proposed development in any material respect (other than periodic notices from Cobb County regarding the landscaping and maintenance of the site, and Seller shall, within 5 days following the Effective Date, provide copies of all such periodic notices to Purchaser); (c) no Governmental Authority has imposed any requirement that would bind Purchaser to pay directly or indirectly any special fees or contributions or incur any expenses or obligations in connection with the development of the Property or any portion thereof, except for customary building permit and

9

inspection fees, customary connection or tap-in fees and other ordinary and usual fees paid by homebuilders, if any; (d) Seller has full right, power and authority to enter into this Contract and, at Closing, will have the right, power and authority to consummate the transactions contemplated thereby and all required corporate, partnership or other action necessary to authorize Seller to enter into and consummate the transactions contemplated herein has been, or upon Closing will have been, taken and the joinder of no person or entity other than Seller will be necessary to execute and deliver such documents and instruments at Closing and to perform all obligations of Seller hereunder applicable thereto; (e) Seller is the legal and equitable owner of the Property and the Lots and has the right to convey such fee simple title by Deed to Purchaser upon Closing free and clear of all options, rights, covenants, easements, liens and other rights in favor of third parties other than the Permitted Exceptions; (f) except as set forth in the Permitted Exceptions, the Property is not subject to any: (i) outstanding agreements of sale, options, liens or other rights of third parties to acquire any interests therein; (ii) ground leases or other leases or tenancies; (iii) real estate, management, supply, promotional, operating, maintenance, security or other service contracts, and Seller shall not further encumber or allow the Property to be encumbered by and of the foregoing after the date hereof, without Purchaser's written consent, which may be granted or withheld in Purchaser's sole discretion; (g) there are no payback agreements, revenue bonds, utility debt service expenses or other charges or expenses applicable to the Property; (h) there are no violations, or threatened or pending violations, of any laws, statutes, ordinances, rules or regulations with respect to the Property open, noticed or existing; (i) except as listed on Exhibit "C" hereof, no litigation or similar actions or proceedings are now pending or threatened against the Property or which could result in any judgment lien against the Property, nor does Seller know of any basis for any such violation, action or claim; (j) there are no unpaid (i) ad valorem real estate taxes or assessments; or (ii) assessments for public improvements pertaining to the Property other than the performance bond for the ~~completion of the roads~~ located on the ~~Property, for which the amount due is $_____, and~~ a copy of which will be provided to Purchaser within 5 days of the Effective Date; (k) the Property and the Lots have access, ingress and egress right to and from public roads and/or highways; (l) there are no underground storage tanks on the Property; (m) the Property has never been used as a landfill or garbage dump; (n) there are no hazardous, toxic or infectious wastes, substances or materials present on the Property in quantities or concentrations in violation of any applicable Environmental Laws; (o) Seller's execution of this Contract and the consummation of the transaction(s) contemplated herein do not and will not result in the breach or default by Seller under any indenture, agreement, instrument, contract or obligation to which the Seller is a party and/or which affects all or any portion of the Property; (p) no commitments or agreements have been made to any Governmental Authority, utility company, school board, church or other religious body, homeowner's association or any other organization group, or individual relating to the Property which would impose upon Purchaser the obligation to make any contributions or dedications of money or land, or to construct, install or maintain any improvements of a public or private nature on or off the Property; (q) the Property and the improvements thereon do not violate any applicable zoning, building or subdivision law, order, agreement, ordinance, rule or regulation. If it is determined before Closing that Seller has breached its representations and warranties set forth in this section, Purchaser shall have the right to terminate this Contract by giving notice thereof to Seller upon the earlier to occur of the Closing Date or within thirty (30) days after Purchaser becomes aware of said breach, and thereafter receive a return of all of the Earnest Money; *provided however*, that, notwithstanding the fact that the Purchaser is acquiring the Lots

in their "as is", "where is" condition, the foregoing sentence shall not act to limit Purchaser's remedies in the event such breach of Seller's representations and warranties is discovered after Closing.

7.02    Purchaser's Representations and Warranties. Purchaser represents and warrants to Seller that (a) there are no attachments, executions or assignments for the benefit of creditors, generally, or voluntary or involuntary proceedings in bankruptcy or under any other debtor-relief laws pending or threatened against Purchaser, and (b) Purchaser has full right, power and authority to enter into this Contract and, at Closing, will have the right, power and authority to consummate the transactions contemplated thereby and all required corporate, partnership or other action necessary to authorize Purchaser to enter into and consummate the transaction contemplated herein has been or upon the Closing, will have been taken, and the joinder of no person or entity other than Purchaser will be necessary to execute and deliver such documents and instruments at Closing and to perform all the obligation of Purchaser hereunder applicable thereto.

## ARTICLE VIII
## BROKERS

8.01    Commissions. Seller and Purchaser hereby agree that the Seller shall pay a real estate commission to Commercial Realty Associates, LLC. ("Broker") at Closing in an amount equal to three (3%) percent of the total Lot Purchase Price paid at the Closing for the Lots. In the event the purchase and sale of any Lot(s) fails to close for any reason whatsoever, then the Broker shall be entitled to no commission or other compensation for Broker's services with respect to such Lot(s). Except for Seller's obligations to Broker, neither Purchaser nor Seller has created any other liability for any broker's fee or commission in connection with this Contract or the consummation of the transactions contemplated hereby. Seller shall indemnify and hold Purchaser harmless from all claims, losses, liabilities and expenses (including, but not limited to reasonable attorneys' fees and court costs) which Purchaser may incur on account of any claim which may be asserted against Purchaser, whether or not meritorious, by any broker or any other person on the basis of any agreements made or alleged to have been made by or on behalf of the Seller. Purchaser shall indemnify and hold Seller harmless from all claims, losses, liabilities and expenses (including, but not limited to, reasonable attorneys' fees and court costs) which Seller may incur on account of any claim which may be asserted against Seller, whether or not meritorious, by any broker or other person (other than Broker) on the basis of any agreements made or alleged to have been made by or on behalf of the Purchaser. The indemnifications set forth herein shall survive the Closing.

8.02    Affiliated Broker. Purchaser and Seller acknowledge that Barry Gittleman, an affiliate of the Purchaser is a licensed real estate salesman under the laws of the State of Georgia but shall not participate in any commission paid in connection with the transactions contemplated by this Contract.

TM 1-31-17

## ARTICLE IX
## SELLER'S DEFAULTS

9.01   Default.   In the event Seller fails to meet any obligation imposed on Seller pursuant to this Contract and such failure to perform or cure shall continue for fifteen (15) days following notice in writing from Purchaser, then Purchaser may, as Purchaser's sole and exclusive remedies, either (i) terminate this Contract whereupon Purchaser and Seller shall be released and relieved of and from any and all further obligations or liabilities under this Contract, except for those obligations or liabilities which expressly survive such termination, and all previously unapplied Earnest Money shall be returned to Purchaser, (ii) enforce specific performance of this Contract (assuming Seller is not prevented from performing its obligations under this Contract by operation of law or court order exercising jurisdiction); or (iii) waive such default and continue to close Lots under this Contract with no reduction in total Lot Purchase Price.

9.02   Partial Default.   In the event Seller is unable at any Closing to convey title to all of the Lots designated by Purchaser for such Closing in accordance with terms, provisions and conditions of the Contract, Purchaser may, at its option and without penalty to it, elect by written notice delivered to Seller either (i) to cancel this Contract, or (ii) to purchase only those Lots which Seller can convey as provided herein, in which case (*a*) the purchase price shall be adjusted to reflect the price of the Lots being purchased (as mutually agreed upon by the Parties during the Inspection Period), and (*b*)  the Closing Date shall be extended for an additional fourteen (14) days to allow time to revise the Closing documents.

## ARTICLE X
## PURCHASER'S DEFAULTS

In the event that Purchaser shall default hereunder and such default shall continue for thirty (30) days following notice thereof in writing from Seller, then Seller may, as Seller's sole and exclusive remedies, declare Purchaser's default under this Contract, terminate the Contract, and retain the Earnest Money as its liquidated damages.

## ARTICLE XI
## ADDITIONAL COVENANTS AND
## POST CLOSING OBLIGATIONS

11.01   Reports.   Following the Effective Date and prior to the Closing, Seller will make available to Purchaser any additional environmental site assessments or notifications affecting the Lots that are received or obtained by Seller (collectively, the "Reports").

11.02   Intentionally Omitted.

11.03   Intentionally Omitted.

Tom 1-31-13

11.04 <u>Protective Covenants.</u> Purchaser acknowledges that each Lot is subject to and encumbered by the Protective Covenants, and Purchaser covenants and agrees that it will comply with the Protective Covenants at all times.

11.05 <u>HOA Fees and Assessments.</u> Purchaser shall not be required to pay any HOA fees or assessments attributable to any Lot until such time as Purchaser conveys such Lot to a third party non-affiliated purchaser. At the time said Lot is conveyed by Purchaser to such third party non-affiliated purchaser, HOA fees and/or assessments attributable to such Lot shall commence to accrue and shall be the responsibility of said third party non-affiliated purchaser.

11.06 <u>Survival.</u> The provisions of this Article XI shall survive Closing.

### ARTICLE XII
### MISCELLANEOUS

12.01 <u>Assignment.</u> The terms and conditions of this Contract are hereby made binding on the executors, heirs, administrators, successors and permitted assigns of the parties hereto. Purchaser may assign this Contract and all of its interests herein to an entity related to Purchaser or affiliated with Purchaser, or to another builder who will acquire a Lot or Lots for Purchaser's intended use, without obtaining the consent of Seller. Upon any assignment, the assignee shall have and be subject to all of the rights, benefits, duties and obligations of the Purchaser hereunder.

12.02 <u>Notice.</u> Any notice to be given or served upon any party hereto in connection with this Contract must be in writing, and will be deemed delivered, whether or not actually received, any notice to be given to any party hereto in connection with this Contract shall be in writing and shall be deemed received (a) on the date delivered if hand delivered by receipted hand delivery and (b) three (3) days after postmark if sent postage prepaid by certified ore registered mail, return receipt requested, (c) on the date delivered if delivered by overnight mail or delivery service (such as Federal Express or UPS) where the carrier provides or retains evidence of the date of delivery, or (d) or upon receipt of electronic correspondence (email or facsimile) with delivery receipt or verification. Notices to the parties shall be sent to their addresses set forth below. Either party, by written notice to the other, may change its address to which notices are to be sent. The parties shall copy Title Company on all notices sent hereunder, but failure to notify Title Company shall not be deemed a failure of notice to a party to whom notice has been given.

      If to Seller:

          Mr. William Touloumis
          Athena Development, LLC
          100 Main Street
          Safety Harbor, Florida 34695
          Email: bill-touloumis@olympia-group.com _2pm 1-31-13_
          Facsimile: 727-734-4042

With a copy to:

    The Slomka Law Firm, PC
    1069 Spring Street, NW
    Atlanta, GA 30309
    Howie@SlomkaLawFirm.com
    Facsimile: (888) 259-6137

If to Purchaser:

    Mr. Todd E. Huss, President
    Fischer Development Co. II, Inc.
    2670 Chancellor Drive, Suite 300
    Crestview Hills, Kentucky 41017
    Email: thuss@fischerhomes.com
    Facsimile: 859-344-7000

With copies to:

    M. Larry Sprague, General Counsel
    Fischer Development Company
    2670 Chancellor Drive, Suite 300
    Crestview Hills, Kentucky 41017
    Email: larry@fischerhomes.com
    Facsimile: 859-344-7000

    Mr. Barry Gittleman
    Fischer Residential, LLC
    508 Water Birch Way
    Marietta, Georgia 30066
    Email: bgittleman@fischerhomes.com
    Facsimile: 859-344-5900

    Timothy McMahon
    Fischer Homes
    6602 East 75th Street, Suite 400
    Indianapolis, Indiana 46250
    Email: tmcmahon@fischerhomes.com

    Lex A. Watson, II, Esq.
    Merritt Watson, LLP
    200 Galleria Parkway, Suite 500
    Atlanta, Georgia 30339
    Email: lwatson@merrittwatson.com
    Facsimile: 770-952-0028

TM 1-31-13

12.03 Entire Agreement. This Contract embodies the entire agreement between the parties and cannot be varied except by the written agreement of the parties.

12.04 Attorney's Fees. If any legal action is commenced by any party to enforce any provision of this Contract, the losing party will pay to the prevailing party all reasonable costs and expenses incurred by the prevailing party including reasonable attorney's fees.

12.05 Dates. Time is of the essence in all things pertaining to the performance of this Contract. Notwithstanding the foregoing, if the final day of a period or date of performance under this Contract falls on a Saturday, Sunday or legal banking holiday for national banks in the State of Georgia, then the final day of the period or the date of performance shall be deemed to fall on the next day which is not Saturday, Sunday or legal banking holiday for national banks in the State of Georgia.

12.06 Application. The terms, provisions, warranties, representations, covenants and agreements contained in this Contract shall apply to, be binding upon, and inure to the benefit of the parties hereto and their respective legal representatives, successors and permitted assigns. This Contract shall, however, be for the sole and exclusive benefit of the parties hereto and their respective legal representatives, successors, and permitted assigns and shall not be construed to confer any right upon any third party, unless so expressly stated herein.

12.07 Cooperation. Seller and Purchaser will each reasonably cooperate with each other, their employees and agents in a good faith attempt to facilitate the purchase of Lots by Purchaser pursuant to the terms and conditions contained herein. Any consent or approval reasonably requested or required by one party under the terms of this Contract shall not be unreasonably withheld or delayed by the other party hereto.

12.08 Applicable Law; Headings. This Contract shall be governed, construed, enforced, and interpreted pursuant to the laws of the State of Georgia. Any section or subsection headings used in this Contract are for convenience of reference purposes only and shall not be used in the interpretation of this Contract.

12.09 Waiver. The failure of Purchaser or Seller to insist in any one or more instances upon the performance of any of the covenants and/or conditions of this Contract, or to exercise any right, power or privilege herein conferred shall not be construed as a waiver by such Party of any such covenant, agreement, condition, right or privilege unless such waiver is in writing and signed by the party waiving such performance, covenant, agreement, condition, right or privilege.

12.10 Force Majeure. Except with regard to the payment of money due, if either party hereto shall be delayed, hindered in, or prevented from the performance of its obligations hereunder by reason of any occurrence which is not within the reasonable anticipation or control of such party, including but not limited to strikes, lockouts, labor troubles, governmental action or inaction, failure of power, riots, insurrection, war, acts of God, or similar reason, and which occurrence, in any event, is not the result of the intentional act, negligence of willful misconduct of such party (a "Force Majeure Event"), such party's performance shall be excused for the

period of time equivalent to the delay caused by such Force Majeure Event, provided such party gives reasonable notice to the other party of such delay.

     12.11  <u>Special Stipulations.</u>  Any Special Stipulations attached hereto as <u>Exhibit "B"</u> are made a part of this Contract and to the extent the terms thereof and the printed terms of this Contract are in conflict, the terms and conditions of the Special Stipulations shall control.

*{Remainder of this page left blank intentionally}*

tom 1·31·13

EXECUTED effective as of the last date executed by Seller and Purchaser as set forth below.

Date of Execution: _____

**SELLER:**

**ATHENA DEVELOPMENT, LLC,**
a Georgia limited liability company

By: _____
Name: William Touloumis
Title: Manager

**PURCHASER:**

Date of Execution: 1-31-13

**FISCHER DEVELOPMENT COMPANY, II, INC.,** a Kentucky corporation

By: _____
Todd Huss
Title: President

17

EXHIBIT "A"

DESCRIPTION OF LOTS

Forty-Six (46) developed residential lots consisting of Lots 2, 3, 5 through 31, and 34 through 50, all located in the Subdivision located in Cobb County, Georgia, as reflected on the final subdivision plat of The Summit at Lost Mountain recorded in Plat Book ___, at Pages ___ through __, Cobb County, Georgia public records (the "Plat"), which Plat is incorporated herein by reference.

# EXHIBIT "B"
## SPECIAL STIPULATIONS

1.  Seller shall until Closing, at its cost and expense, maintain the Property, any common area, all Lots owned by the Seller, and all development infrastructure including, but not limited to, streets, sewer lines, water lines and electrical lines in the current condition and state of the Property and/or such development infrastructure; *provided however*, that Purchaser shall be responsible for, and shall repair and restore, any development infrastructure damaged by Purchaser and/or Purchaser's agents or contractors.

2.  Purchaser and Seller acknowledge that Seller is currently the Debtor Party in that certain Chapter 11 bankruptcy action pending in the U.S. Bankruptcy Court, Middle District of Florida, Tampa Division (the "Bankruptcy Court"), Case No. 8:12-bk-00011-MGW (the "Bankruptcy Case"), and further acknowledge that on July 9, 2012 the Bankruptcy Court issued an order that provided, among other things, that Seller is to convey the Property and Lots to German American Capital Corp. (the "Lender") in satisfaction of Seller's obligations to the Lender, and that such conveyance has not taken place as of the Effective Date.

    Purchaser and Seller acknowledge that the total Lot Purchase Price is, or may be, less than the amount of the existing indebtedness owed to the Lender and encumbering the Property, and that this Contract is contingent upon the Seller or Seller's agent obtaining, in a form satisfactory to Purchaser:

    (i) the written agreement (in a form satisfactory to Purchaser) from Lender ("Lender's Approval") that at Closing and upon Purchaser's payment of the Purchase Price as provided in this Contract, Lender will release the Lender's lien and security deed encumbering the Property, and to assign to Purchaser all rights Lender may have under that certain Assignment of Contract Rights of Declarant dated 08/29/2005 from Seller to Branch Banking and Trust Company and recorded in Book 14212, Page 1324 of the public records of Cobb County, Georgia, and

    (ii) the consent and approval of the Bankruptcy Court (the "Court Approval") to the sale of the Lots and Property to Purchaser pursuant to the terms of this Contract, free and clear of all liens and encumbrances other than the lien/encumbrance to be released by Lender at Closing pursuant to item (i) of this Section 2.

    Seller shall have sixty (60) days after the Effective date to obtain such Lender's Approval and Court Approval (the "Short Sale Approval Date"). In the event such Lender's Approval and the Court Approval is not obtained by Seller on or before such Short Sale Approval Date, Purchaser may, at its option and its sole discretion, by written notice to Seller (i) declare Seller to be in default of this Contract and exercise its remedies under Article IX, or (ii) by written notice to Seller, grant Seller an additional period of time to obtain such Lender's Approval and Court Approval.

19

Within five (5) business days from and after the Effective Date, Seller shall submit to Lender a copy of this Contract for its approval of the transaction contemplated by this Contract and for obtaining Lender's Approval. Seller shall diligently pursue obtaining Lender's Approval and shall, upon request from Lender, provide Lender with such additional information as may be reasonably requested by Lender in connection with the issuance of Lender's Approval, and shall , cooperate with Purchaser in any negotiations with Lender.

Within five (5) business days from and after the Effective Date, Seller shall, by and through its counsel, file with the Bankruptcy Court such documents as may be required to obtain the Court Approval, and shall simultaneously provide copies of the same to Purchaser, and shall actively seek the cooperation of the Lender to obtain such Court Approval.

Purchaser and Seller understand that a Lender is not required to agree to the transaction contemplated herein, and that Lender may require that in exchange for Lender Approval that some terms of the Contract be amended in order to obtain such Approval. The parties acknowledge that neither Purchaser nor Seller shall be obligated to agree to any of Lender's proposed terms or amendments, and that either party may, in its sole discretion, reject the amended terms required by Lender.

Purchaser may cancel this Contract at any time after the end of the Inspection Period but prior to Closing if the Lender Approval and the Court Approval have not been received by Seller and delivered to the Purchaser, and upon such cancellation of this Contract, all Earnest Money shall be returned to Purchaser.

Seller acknowledges that it may incur costs in connection with its obtaining the Lender Approval and the Court Approval. Such costs shall be the sole responsibility of the Seller.

The requirement that Purchaser pay to Seller the Closing Date extension fee described in the definition of the Closing Date as set forth in this Contract shall be waived by the Seller until such time as the Lender Approval and the Court Approval are received by Seller and delivered to Purchaser.

TM 1-31-13

EXHIBIT "C"
LITIGATION

1.  *Carl Bledsoe v. Olympia Development Group, Inc., et al.*, Superior Court of Cobb County, Case No. 11-1-01998-CV, the same having been dismissed, without prejudice, on May 2, 2012.

2.  Chapter 11 bankruptcy action pending in the U.S. Bankruptcy Court, Middle District of Florida, Tampa Division, *In re Athena Development, LLC*, Case No. 8:12-bk-00011-MGW

TM 1-31-13

# FIRST AMENDMENT TO
# LOT PURCHASE AGREEMENT

This First Amendment (the "Amendment") to the Lot Purchase Agreement dated January 31, 2013 (the "Agreement") is made and entered effective as of the ___ day of March, 2013 by and between **ATHENA DEVELOPMENT, LLC,** a Georgia limited liability company (the "Seller") and **FISCHER DEVELOPMENT COMPANY II, INC.,** a Kentucky corporation (the "Purchaser").

## W I T N E S S E T H:

**WHEREAS,** the parties wish to extend the Inspection Period, as that term is defined in the Agreement;

**NOW THEREFORE,** for and in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

### 1.

The definition of the "Inspection Period" contained in Article I of the Agreement is hereby deleted and the following shall be substituted in its stead:

> "Inspection Period" means the period of time commencing upon the Effective Date and ending on the ninetieth (90th) day thereafter.

### 2.

The definition of "Earnest Money" contained in Article I of the Agreement is hereby amended by deleting item (a) in such definition and substituting the following in its stead:

> "(a) the initial sum of Fifty Thousand and No/100 Dollars ($50,000.00), which amount shall be deposited by Purchaser with the Title Company within five (5) business days from and after the Effective Date, and the sum of Five Thousand Dollars ($5,000.00) , which amount shall be deposited by Purchaser with the Title Company within five (5) business days following the execution by the Purchaser and the Seller of the First Amendment to the Lot Purchase Agreement dated January 31, 2013."

### 3.

Except as amended herein, the parties hereby ratify and affirm the terms and provisions of the Agreement.

*{Remainder of this page left blank intentionally}*

**IN WITNESS WHEREOF**, the parties have hereunto set their hands effective as of the date first above written.

**SELLER:**

Date of Execution: _____

**ATHENA DEVELOPMENT, LLC**, a Georgia limited liability company

By: _____
Name: William Touloumis
Title: Manager

**PURCHASER:**

Date of Execution: 3/14/13

**FISCHER DEVELOPMENT COMPANY, II, INC.**, a Kentucky corporation

By: _____
Todd Huss
Title: President